# Commonwealth Life Insurance Company v. Spears.

(Decided May 6, 1927.)

## Appeal from Pike Circuit Court.

1. Insurance.—In action on policies of life insurance, with defense of fraud in application and medical examination, and reply that false answers in application were inserted without knowledge of insured, and denying falsity thereof, held that the burden of proof was on the insurer.

2. Evidence.—In action on policies of life insurance brought by beneficiary, admitting as substantive evidence beneficiary's testimony that the examining physician told him that the insurer had asked how $1,000.00 would look to him to be a witness for it, and that the physician had told another the same thing and similar testimony, held error.

3. Evidence.—In action on policies of life insurance, testimony of beneficiary that examining physician of insurer told third party that insurer had asked how $1,000.00 would look to him to be its witness in the case, held inadmissible as hearsay.

4. Witnesses.—In action on policies of life insurance, where beneficiary introduced testimony that insurer's agent had made statement derogatory to insurer, excluding testimony of agent that he had not made statement held error.

5. Insurance.—In action on policies of life insurance, where plaintiff beneficiary claimed that false answers in application and medical examination were made by insurer's agents and examining physician, and that beneficiary was acting in good faith, evidence held to show that beneficiary consented to and participated in any fraud by the agents and examining physician in procuring insurance.

6. Insurance.—Where the insured is a party to the fraud of medical examiner or agent, he will not be permitted to profit thereby.

A. J. MAY, ED. L. ALLEN and BURNETT, BATSON & CARY for appellant.

O. A. STUMP and FRANK P. DAMRON for appellee.

Opinion of the Court by Judge Thomas—Reversing.

On July 3, 1923, the appellant and defendant below, Commonwealth Life Insurance Company, issued two joint policies on the lives of appellee and plaintiff below, Ballard Spears, and his wife, Dolly Spears, the survivor to be the beneficiary in each one. On March 19, 1924. another similar policy was issued for the same amount. On June 7, 1924, the wife, Dolly Spears, died; defendant declined to pay the policies, and plaintiff brought this

action against it to recover $3,000, the total amount of
all of them. Two defenses were interposed, (a) that the
insured had made false answers in her application and in
her medical examination that were material to the risk,
and which were fraudulently done and procured to be
done by herself and her husband, the plaintiff, and (b)
that each of the policies were procured by the fraud and
collusion of plaintiff with defendant's agent and the ex-
amining physician. Appropriate pleadings made the
issues, and upon trial there was a verdict for plaintiff
for the full amount sued for and defendant's motion for
a new trial having been overruled it prosecutes this
appeal. Numerous grounds are relied on for a reversal
of the judgment pronounced on the verdict of the jury,
among which are (1) error of the court in adjudging the
burden of proof on defendant; (2) incompetent evidence
admitted over the objections of defendant, and (3) im-
proper and erroneous instructions given to the jury over
defendant's objections and refusal of the court to give
to the jury instructions offered by it, including a peremp-
tory one directing a verdict in its favor. Other objec-
tions are included in the motion for a new trial, but, be-
cause of our conclusion stated below, it will be unneces-
sary to either specify or determine them, but we will
briefly discuss and dispose of the three named above in
the order specified.

1. In avoidance of the false answers relied on in
defense (a), plaintiff in his reply stated that defendant's
agents filled out the application and the medical exami-
nation without interrogating the insured and inserted
the false answers complained of without her knowledge
or consent, all of which was appropriately denied. If
that was the single issue relating to the false answers and
statements relied on, no doubt defendant would be cor-
rect in its complaint that it was erroneously adjudged the
burden of proof; but that avoidance was not the sole
reply to defense (a.). The other one was a denial of the
false answers, and so we conclude that, upon the whole
defense as made, the court did not err in adjudging the
burden of proof on defendant.

2. One Dr. Claypool was the examining physician.
While plaintiff was on the stand he was asked if he had
a certain conversation with the doctor after his wife died,
and over the objections of defendant he was permitted
to answer in the affirmative, following which he was then

asked: "Did Dr. Claypool tell you in that conversation that they (meaning the insurance company) had asked him, 'How would $1,000 look to him (Claypool) to be a witness in this case for the defendant?'" Defendant's objection was overruled to that question, and the witness answered in the affirmative. He was then asked: "Did he (the physician) tell Bernard Porter the same thing?" That question was also objected to and overruled, and the witness answered "They said that he did." Similar inquiries were made concerning derogatory statements to the defense alleged to have been made by certain other of its agents long after the involved transactions, with similar objections and with similar results. It requires no arguments to demonstrate that such testimony is wholly incompetent and greatly prejudicial as substantive evidence against defendant. If the statements of the various agents inquired about had been asked them when they were on the stand for the purpose of manifesting their interests and to contradict them, it no doubt would have been competent for contradictory purposes. But even then the court should have admonished the jury as to its purpose. Moreover, what the plaintiff stated as to what Claypool had told Porter was not only subject to the criticism just made, but to the further one that it was rank hearsay and was not admissible, even for contradictory purposes, except and unless it was testified to by Porter if it was true. However, the latter did later give such testimony as substantial proof, and which was erroneous for the reason stated. One of the agents, after his alleged derogatory statement had been proven as substantive testimony, was put upon the stand by defendant for the purpose of denying it, and the court refused to allow him to do so, which was also grossly erroneous. The above testimny constitutes the chief errors under ground 2, and would authorize a reversal of the judgment if there were no other reasons therefor.

3. A disposition of ground 3 calls for a brief statement of the facts, and which discloses to our minds a most glaring fraud attempted to be perpetrated on defendant in the procurement of the insurance covered by each policy on the life of Dolly Spears. One Arnold, who resided in Prestonsburg, Ky., was the accredited agent of defendant in the territory where plaintiff resided. It seems that he had associated with him as a kind of subagent, one Emmett Hamilton, who had known deceased

practically all her life and who himself resided at the time of the issual of all of the policies sued on, about 8 miles from plaintiff. Plaintiff ran a country store, and his residence was on the same lot a short distance there-from. On the morning of July 3, 1923, Arnold, Hamilton, and Dr. Claypool started to a point beyond plaintiff's residence for the purpose of effecting insurance on another prospect, and they stopped at plaintiff's store, who, it seems, had discussed to some extent the subject of insurance with Hamilton prior thereto. Within a short while plaintiff, after the joint policy had been explained to him, suggested that they go and consult Mrs. Spears, who was in the residence. She at first rebelled against the proposition, but was finally persuaded and agreed to the issuing of one policy for $1,000. Both she and her husband were then and there asked the questions propounded in the applications, and the answers were written by Arnold, and each application was signed by plaintiff, the husband, by him subscribing his name to his application and the name of his wife to her application. The physician then went out in the yard with Mrs. Spears and interrogated her as contained in the medical examination, and after the questions were all answered in that manner, he and she returned to the house where plaintiff signed her name thereto. The first two policies were issued, based upon such applications and medical examinations, and later delivered and the premiums collected. Some time prior to the issual of the third policy plaintiff wrote Hamilton a letter requesting an additional policy of $1,000 similar to the other two. Hamilton then went to plaintiff's residence, and was informed by him that Mrs. Spears was in the same condition of health, with no changes, as she was when the application for the first two policies was made. With that understanding Hamilton copied the attached application to one of the first policies, and plaintiff subscribed the names of himself and wife to it. He thereupon in the same manner subscribed blank medical examinations, and Hamilton took them to Claypool with copies of his first medical examination, and, upon being informed that there was no change in the health conditions of each of the insured, he filled out the medical examinations for the third policy to correspond with those of the first two, and, upon the applications and examinations thus made, the third policy was issued by defendant.

The proof shows without contradiction that at the time of the issual of the first two policies Mrs. Spears was not only suffering with tuberculosis, but had been frequently attacked with spasms of hemorrhage of the lungs, and at times, especially at night, with much coughing and expectoration. It is uncontradictedly proven that before the issuing of either policy plaintiff would spread newspapers upon the floor by the side of his wife's bed upon which she expectorated, and which likewise received the results of her hemorrhages. He would burn the paper the next morning and then use a disinfectant, which the witnesses (including the mother and brothers of Mrs. Spears) said was carbolic acid, but plaintiff stated that it was some other drug. In March, 1923, nearly four months before the issuing of the first two policies, plaintiff carried his wife to Dr. Thompson at Pikeville, and, after diagonosing her case and receiving a history from her and her husband, the plaintiff, he pronounced her affliction as tuberculosis, and directed that she take light exercise, sleep with doors and windows open, and stay in the sunshine as much as possible; all of which it was explained was for purposes of alleviation, and not for permanent cure. Before issuing of the last policy, plaintiff also carried his wife to the hospital at Martin, Ky., operated by the Stumbo Bros. His brother-in-law went along, and he and the two doctors testified that they advised plaintiff, in substance, that his wife's condition was hopeless, since she was at the time rapidly approaching the grave from the effects of her deadly malady. The brother-in-law testified that after leaving the hospital plaintiff told him, in substance, that the doctors imparted no news to him, and that the only thing he knew to do was to get some more insurance, which was accordingly done in the issual of the third policy. Plaintiff testified that he knew that his wife's health was in failing condition from the time of the birth of her last child, which was in October, 1922, long before the issual of any of the policies. The child died in January, 1923, and he testified that the visit to Dr. Thompson in March thereafter was for treatment of the child who had died two months before, and not in the interest of his wife.

In making out his certificate of claim under the policies, plaintiff stated that the duration of the last illness of his wife was "about five weeks," and that her health began to decline "about May 1, 1924," and that during said affliction she had "cough and fever." He

was also asked therein the name and residence "of every physician" who attended his wife during the last year prior to her death or since her health began to decline, and he gave the name only of Dr. N. D. Flanery of Pikeville, Ky., omitting entirely the other physicians hereinbefore referred to. In the burial permit, required by statute to be made, plaintiff stated that his wife had died of "quick consumption and stomach trouble."

In addition to the foregoing, at the time of the issuing of the first two policies plaintiff had sent for and obtained some kind of patent preparation advertised as a cure for consumption, and was then giving it to his wife. There can be no doubt but what plaintiff knew long before the issual of either policy that his wife was afflicted with a hopeless case of tuberculosis, and it made gradual inroads on her health until she finally succumbed to its ravages, and plaintiff was aware of the facts all the while. Indeed, his counsel admit as much, but rest the entire case upon the contention that their client is innocent, and the agents of the defendant are guilty of the fraud which he concedes has been perpetrated on it. He plants himself on that line of cases where the agent falsely writes the answer in the application or medical examination without the knowledge or consent of the insured or the beneficiary under the policy who is the survivor in a case like this; and, if the facts in this case measured up to the cases upon which he relies, there could be no criticism of his position, provided it was true that the agents made such false answers and the applicant was acting *in good faith* and was thereby deceived. In that case the company would be estopped to rely on the derelictions of its agents.

A late case so holding is Aetna Life Insurance Company v. McCullagh, 185 Ky. 664, 215 S. W. 821. There is no evidence whatever in this case to show that Arnold, the accredited agent of defendant, knew any of the previous history of Mrs Spears, or that he made any false answers in her application, except that of the plaintiff himself, who on cross-examination qualified his positive testimony in chief by saying that, if certain material questions were asked his wife, *he did not hear them.* The same sort of negative testimony was given by plaintiff as to the answers made by his wife in her medical examination some 20 feet away, and he admitted in his testimony that while it was going on he was engaged in a promiscuous conversation with Hamilton and Arnold, all three

of whom were in his residence. But beyond that, he afterwards signed his wife's name to both the application and the medical examination, which were documents upon which the policies thereafter issued were based and in which he was not only a joint insured but likewise a contingent beneficiary, and both he and his wife are each to be viewed in the light of an insured in the execution of such papers for the procuring of such policies. He does not claim that he was fraudulently procured to sign those papers as made by his wife; nor does he claim that they were misread to him, nor did any agent of defendant interpose any obstruction to his reading them, which, if he had done, he would have at once known that many of the answers therein were incorrect, and especially the one that denied the then existence of the wife's affliction and from the effects of which she later died.

The record thoroughly discloses that, if any of the agents capable of binding defendant attempted the perpetration of any fraud on it, plaintiff was aware of it, consented to it, and actually participated in it. At the time of the issuing of the first two policies, he knew that his wife had been in declining health at least from October prior thereto; that she had lost in weight; that she had every sympton of tuberculosis for which he was treating her with his patent remedies; and that it had advanced to the stage of producing hemorrhages of her lungs. According to his own testimony, he not only permitted and consented but acquiesced in her being persuaded over her objections to the issuing of one policy which was doubled by the issuing of two, and later followed by the issual of the third one under the circumstances above enumerated. Aside from such glaring facts there are many others in this record some of which we have stated which conclusively demonstrate that, as to the issuing of the policies, "Barkus was willing." He, therefore, cannot be considered as an insured "acting in good faith," although some or all of the insurance agents may have been acting in bad faith towards their principal and thereby falsified the answers in the application and the medical examination. Indeed, it is not shown that the wife ever heard of the third policy, nor of the doubling of the amount of the first by issuing two policies instead of one, but it is in proof that she complained of issuing any policy both at and subsequent to

their issual, because she insisted that, owing to her physical condition, and, stating it as she did, "it was gambling on her life." If, therefore, defendant's agents having authority to do so knowingly misrepresented the facts in the applications or in the medical examinations, plaintiff was aware of it, and cannot be considered in any other light than as assenting thereto, and, that being true, it established defense (b), relied on in the answer. That such collusive action is a defense to a policy obtained thereby, see Joyce on Insurance, section 404, vol. 2, 32 C. J. 1290 and 1337, and 14 R. C. L. 1178, par. 353.

The general rule without exception, is thus stated in the latter publication:

> "Of course, where the insured is a party to the fraud of the medical examiner or agent he will not be permitted to profit thereby."

A number of cases are cited in note 9 to the text, and we have already seen that the McCullagh case, supra, avoids the false answers made by an agent in attempting to perpetrate a fraud on his company only when the insured is "acting in good faith."

The proof is overwhelmingly convincing in this case that plaintiff knew his wife was not an acceptable life insurance risk, as well as that her continued life was of but short duration, and that the disease with which she was afflicted was beyond the skill of medical treatment, since he had been so informed by Dr. Thompson as well as by the Stumbo Bros., to say nothing about his actual observation from constant contact with her. We have no trouble in concluding, therefore, that, if any of defendant's authorized agents were guilty of falsifications in any of the respects herein before discussed, the plaintiff was in collusion therewith, and that he should not be permitted to recover for the fraud thus practiced by him on the defendant. The latter tendered with its answer the premiums that had been paid on all the policies, thus restoring plaintiff to the position he occupied before the policies were issued, which is all he is entitled to demand under the facts as appearing in the record, and, if upon another trial they should be substantially the same, the motion by defendant for a peremptory instruction should be sustained; but, if plaintiff should introduce additional evidence tending to disconnect him from any collusion with any of defendant's agents in making any of the false

answers relied on, if it should be found that they were so made, then the court should instruct the jury as embodied in instruction G offered by defendant, and which, in substance, said to the jury that if they believed the policies were procured by fraudulent collusion of defendant's agents and plaintiff, then they should find for defendant.

Wherefore the judgment is reversed, with directions to sustain the motion for a new trial and to set aside the judgment and for proceedings consistent with this opinion.